USA v. Giovanella                        CR-92-87-B      04/20/93
                UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF NEW HAMPSHIRE


<u>United States of America</u>

        v.                          Criminal No. 92-087-01-B

<u>Albert L. Giovanella, Jr.</u>


                         <u>O R D E R</u>


     Defendant Albert L. Giovanella, Jr. has moved to postpone
indefinitely his trial on an eleven-count indictment because he
allegedly is too ill to stand trial.  For the reasons that
follow, I deny his request.

     I.  <u>Procedural History</u>

     The defendant was indicted along with his son, Albert L.
Giovanella, III, and Louis J. Berger in October 1992.[1]  The
indictment charges the defendant with wire fraud, 18 U.S.C. §
1343, conspiracy, 18 U.S.C. § 371, bank fraud, 18 U.S.C. § 1344,
various counts of laundering monetary instruments, 18 U.S.C. §
1956, engaging in a monetary transaction involving criminally
derived proceeds, 18 U.S.C. § 1957, and the use of false
documents to avoid a student loan debt, 18 U.S.C. § 1001.

_____

     [1]Defendant Berger plead guilty prior to trial and the
charges against the defendant were severed from those against his
son.

The wire fraud, bank fraud, and conspiracy charges result from the purchase of a home by the defendant's son. The Government alleges that the defendant masterminded a criminal conspiracy to enable his son to purchase the home by fraudulently obtaining a substantial mortgage loan. The money laundering charges concern funds that the defendant allegedly obtained from third parties to cover certain additional costs associated with the purchase of the home. The false document charge concerns documents that the defendant allegedly submitted to a government agency to avoid his son's student loan debts.

On February 19, 1993, I held an evidentiary hearing on defendant's Motion for Indefinite Postponement of Trial (document no. 37). Following the hearing, I reviewed the videotape depositions of several witnesses who could not be present at the hearing. I also reviewed the exhibits produced at the hearing, as well as affidavits and memoranda submitted after the hearing at my request.

II. Discussion

A. The Legal Standard

The First Circuit Court of Appeals has articulated a clear legal standard which must be used in ruling on a claim that a defendant is too ill to stand trial. This standard requires the

exercise of discretion in weighing the risk of harm to the defendant against the public's interest in a trial.  United States v. Zannino, 895 F.2d 1, 13-14 (1st Cir. 1990), cert. denied, 494 U.S. 1082 (1990).  In considering the defendant's interest, the court has held that "the impending trial must pose a substantial danger to a defendant's life or health" in order to justify a continuance.  Id. at 14 (quoting United States v. Brown, 821 F.2d 986, 988 (4th Cir. 1987)).  In assessing a claim of medical dangerousness,

> the [district] court must carefully
> investigate the situation, assemble the
> pertinent data, and then consider not only
> the medical evidence but also the defendant's
> activities (in the courtroom and out of it),
> the steps defendant is taking (or neglecting
> to take) to improve his health, and the
> measures which can feasibly be implemented to
> reduce medical risks.

Id.  In weighing the public's interest, the district court should consider the likelihood that the defendant's medical condition will improve over time so that a trial can occur at a later date, the nature and severity of the charges, and the Government's interest in trying the defendant.  Id.

    B.   The Defendant's Medical Condition

The defendant suffers from post-polio syndrome.  This condition develops twenty-five to thirty-five years after the

3

onset of polio and manifests itself by weakness in the muscles in areas previously affected by the polio. It is a serious medical condition which only worsens with time and can lead to death. In the defendant's case, the post-polio syndrome has significantly affected his ability to breathe without support from a ventilator. He also has difficulty swallowing, and the disease has affected his arms and legs.

Approximately four years ago, the defendant underwent a tracheotomy so that he could use a ventilator to help him breathe. The defendant is currently required to use a ventilator for as much as seventeen hours per day and can breathe without the ventilator for no more than two to three hours at a time. Accordingly, he would be required to use a ventilator during the trial.

The defendant uses a portable ventilator which fits on the top of a nightstand and could easily be used by the defendant in court. The defendant has chosen not to use a device which would allow him to speak while he is using the ventilator. However, the defendant could remove himself from the ventilator for several hours at a time to testify if he wished to do so. He would be able to communicate with counsel and the court in writing while he is using the ventilator.

4

The defendant also suffers from a significant psychological condition. He has received electroconvulsive treatment on several occasions in the past and has attempted suicide more than once. He is currently taking several psychiatric medications. He has suffered in the past from bipolar disorder, which is in remission at the present time. He currently suffers from adjustment disorder with anxiety. His difficulty in dealing with anxiety is exacerbated by stress. One psychologist who examined him stated that he thought it was unlikely that the defendant could participate in a trial because of the effect that the stress of trial would have on his physical condition.[2]

I received testimony from three pulmonologists who examined the defendant and are familiar with his medical condition. None of these experts testified that it would cause a substantial risk to the defendant's health if he were required to stand trial under proper circumstances. Dr. Bartolome Celli, a pulmonologist

---

[2]Dr. Ronald Ebert wrote a letter to the defendant's counsel in which he offered this opinion. His opinion appears to be based primarily on a concern that the stress of trial would cause the defendant to hyperventilate and thus render his ventilator ineffective. Dr. Ebert reported that a respiratory therapist told him that such an occurrence could have fatal consequences. I discount this opinion because the pulmonologists who testified on this subject agreed that there was no significant likelihood that the defendant would die or suffer serious injury from hyperventilation.

with extensive experience in treating post-polio syndrome, opined that it would not threaten or shorten the defendant's life to subject him to the stress of a trial. Dr. Thomas Akey has expressed a similar opinion provided that certain protective measures were taken during the course of trial.[3] Dr. Douglas Johnson testified that it is unlikely that the defendant would suffer serious problems if he were subjected to trial. However, Dr. Johnson expressed a concern that a stressful situation such as a trial could cause the defendant to aspirate saliva which could lead to a lung infection or pneumonia. When he was asked to assess the likelihood of such an occurrence, Dr. Johnson suggested that there was between a 5-10% chance that stress would cause the defendant to aspirate significant amounts of saliva and between a 10-30% chance that if significant aspirations occurred, lung infection or pneumonia would follow. Neither Dr. Celli nor Dr. Akey expressed concern that the defendant was likely to aspirate enough saliva to pose a significant health risk if he were subjected to trial.

I received evidence concerning two instances in which the defendant exhibited a serious adverse reaction to a stressful

[3]Dr. Akey recommended that a certified respiratory therapist be in attendance throughout the trial and that the trial days and total length of trial be shortened.

event.  The first occurred on August 25, 1992, when the defendant, while under indictment on unrelated fraud charges, briefly attended a hearing before Judge A. David Mazzone in Boston.  The defendant, who was brought into the hearing on a stretcher, was not breathing in synchronization with his ventilator, and, as a result, became very agitated and appeared to be in considerable distress.  His difficulties eventually became so pronounced that Dr. Celli, who was in attendance at the hearing, had to ventilate him manually.  Judge Mazzone was so distressed by this incident that he immediately ruled that the defendant was physically unable to stand trial.

The second instance occurred on April 20, 1992, when the defendant was brought to Dr. Akey's office for an evaluation. The defendant's apparent reaction to the stress of the trip and his impending evaluation was so severe that he was taken from Dr. Akey's office and brought to the hospital where he was treated with morphine to calm him down.

I also received evidence that the defendant attempts to exaggerate and exploit his medical condition when it suits him. A witness testified that the defendant would answer the telephone in a weak, sickly voice, and then switch to a normal voice when he learned who was calling.  Other witnesses testified that he

would present himself as being dependent on a wheelchair when others were known to be present, but walk around without any apparent difficulty when he thought he was not being observed. It is impossible to determine on the current record whether the defendant's difficulties in Judge Mazzone's courtroom and Dr. Akey's office were self-induced to support his claim that he was too ill to be tried on the charges pending before Judge Mazzone. Nevertheless, it is reasonable to expect that the defendant will repeat the behavior he exhibited in Judge Mazzone's courtroom if he is required to participate in a trial on the present charges.

## C. The Government's Interest in a Trial

The defendant faces eleven serious felony charges. The Government alleges that the defendant was the mastermind of a criminal conspiracy in which a bank was defrauded of more than $300,000. Various other parties, including the Government, were also allegedly defrauded of additional significant sums. The defendant has three prior convictions for fraud offenses which date back to the 1960s. Given the seriousness of the current charges and the defendant's criminal history, the Government argues that the defendant faces a potential sentence under the Sentencing Guidelines of more than ten years in prison. Even without adopting the Government's conclusions concerning the

8

specific sentence the defendant faces, there can be no dispute that the charges against the defendant are extremely serious and that the Government will be seeking a substantial period of imprisonment if he is convicted on all of the outstanding charges.

III. <u>Conclusion</u>

When considering all of the evidence in the record, I cannot conclude that the medical risk to the defendant in subjecting him to trial outweighs the Government's interest in obtaining a resolution of the outstanding charges. Although the defendant undeniably suffers from serious medical and psychological problems which will make a trial difficult for the court and unpleasant for the defendant, the record does not establish that his health will be significantly endangered by subjecting him to trial under appropriate conditions. Moreover, any temporary discomfort or distress that the defendant may experience in being subjected to the rigors of a trial does not outweigh the Government's interest in bringing the defendant to trial.

In view of the defendant's medical condition, certain precautions will be taken to avoid undue strain on his health. First, trial will be limited to no more than four hours per day. Second, the Government will be limited as to the number of counts

it can bring to trial and the evidence it will be permitted to produce so as to ensure that the trial can be completed in less than two weeks. Third, the Government shall arrange to have a certified respiratory therapist present throughout the trial at the Government's expense. Fourth, I will make reasonable accommodations during the trial to address the defendant's health problems. For example, the defendant will be permitted to testify via videotape deposition if he so chooses. Moreover, if the defendant would prefer to leave the courtroom and view the trial by television at another location in the courthouse, I will attempt to accommodate such a request.

A scheduling order setting the dates and times of the defendant's arraignment and trial will follow.

SO ORDERED.

_____
Paul Barbadoro
United States District Judge

April 20, 1993

cc:   Mark Larsen, Esq.
      U.S. Attorney
      U.S. Probation
      U.S. Marshal

10